JOURNAL ENTRY AND OPINION
{¶ 1} At approximately 9 p.m. on March 11, 2004, plaintiff-appellant, Charisse Walker, decided to walk to a store located across the street from her apartment. Walker took one step out of the back door of her apartment building and then slipped on a sheet of ice. She felt a "sharp pain" in her right ankle, but thought it was something she could "shake off," so she kept walking to the store. She limped through the parking lot of the apartment complex, but, as she reached the end of the lot, she stepped in a pothole. Walker testified that "the ankle broke, it felt like in half, and [she] fell to the ground." As a result of her injury, Walker had three surgeries on her ankle; the third cast was finally removed in December 2004, nine months after the accident.
 {¶ 2} Walker subsequently filed suit against defendants-appellees, RLI Enterprises, Inc. and Vividus, Ltd., and Ken Ippoliti, individually, as the owner and manager of RLI and Vividus. Walker asserted that appellees, who owned and managed the apartment complex where she lived, were negligent in their maintenance of the premises, because they had notice that ice would accumulate outside the back door of the apartment building as a result of a leaky water faucet by the door. Walker also contended that appellees were negligent because they knew about, but did not fix, the numerous potholes in the parking lot. *Page 2 
 {¶ 3} After the trial court granted Ippoliti's motion for summary judgment, which Walker does not challenge in this appeal, RLI and Vividus filed a joint motion for summary judgment.
 {¶ 4} The trial court granted appellees' motion. It found that the faucet had been repaired before Walker's fall and appellees had no notice of any unnatural accumulation of ice caused by the leaky faucet. It further found that Walker had failed to demonstrate an issue of material fact regarding the condition of the parking lot and appellees' lack of notice of the condition. The trial court stated, "although [Walker] alleges she fell in a chuckhole, there is no evidence that [appellees] had notice of any chuckholes, let alone the particular one [Walker] alleges caused the fall."
 {¶ 5} Walker asserts three assignments of error on appeal. She contends that the trial court erred in granting appellees' motion for summary judgment, because appellees had notice both that ice was accumulating as a result of the leaky faucet and of the potholes in the parking lot. She argues further that the trial court erred in granting summary judgment, because the proximate cause of her injuries was appellees' failure to correct these dangerous conditions on its premises. We address Walker's assignments of error together, because they all relate to whether the trial court properly granted summary judgment in favor of appellees.
 Standard of Review *Page 3 
 {¶ 6} Civ.R. 56(C) provides that summary judgment is appropriate when: 1) there is no genuine issue of material fact, 2) the moving party is entitled to judgment as a matter of law, and 3) after construing the evidence most favorably for the party against whom the motion is made, reasonable minds can reach only a conclusion that is adverse to the nonmoving party. Zivich v. Mentor Soccer Club, Inc. (1998),82 Ohio St.3d 367, 369-370; Temple v. Wean United, Inc. (1977),50 Ohio St.2d 317, 327. We review the trial court's judgment de novo using the same standard that the trial court applies under Civ.R. 56(C). Grafton v.Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105.
 {¶ 7} In order to defeat a motion for summary judgment on a negligence claim, a plaintiff must establish that a genuine issue of material fact exists as to whether: 1) the defendant owed a duty of care to the plaintiff; 2) the defendant breached that duty; and 3) the breach of duty proximately caused the plaintiff's injury. Texler v. D.O. SummersCleaners Shirt Laundry Co. (1998), 81 Ohio St.3d 677, 680.
 {¶ 8} Under R.C. 5321.04(A), part of Ohio's Landlord and Tenant Act, a landlord must "[k]eep all common areas of the premises in a safe and sanitary condition." The Ohio Supreme Court has concluded that R.C.5321.04(A) "requires landlords to conform to a particular standard of care, the violation of which constitutes negligence per se." Sikora v.Wenzel (2000), 88 Ohio St.3d 493, 496. To constitute negligence per se, the plaintiff tenant must show that the landlord *Page 4 
either knew or should have known of the factual circumstances that caused the violation. Id. at 498, clarifying Shroades v. Rental Homes,Inc. (1981), 68 Ohio St.2d 20. Moreover, even if negligence per se is established, the plaintiff tenant must also prove proximate cause and damages before the landlord can be held liable. Sikora, supra at 496-497 ("Negligence per se lessens the plaintiffs burden only on the issue of the `actor's departure from the standard of conduct required of a reasonable man.' `Such negligence makes the actor subject to liability * * * but it does not necessarily make him liable.'" [citations omitted]).
The Leaky Faucet
 {¶ 9} R.C. 5321.04(A) does not impose a duty on landlords to keep common areas of the premises clear of natural accumulations of ice and snow. LaCourse v. Fleitz (1986), 28 Ohio St.3d 209, syllabus. In their motion for summary judgment, appellees argued that the ice Walker slipped on was a natural accumulation. They asserted that the leaky faucet had been fixed prior to Walker's fall and there was no evidence that appellees knew that it had resumed leaking subsequent to the repair. Walker, on the other hand, argued that the faucet was not fixed prior to her fall, causing an unnatural accumulation of ice, which appellees were responsible for clearing. We find the evidence in the record creates genuine issues of fact regarding whether the faucet was fixed prior to Walker's fall and whether appellees knew or should have known that it was still leaking. *Page 5 
 {¶ 10} Laura Hominsky, property manager for RLI Enterprises, which managed the apartment complex where Walker lived, acknowledged in her deposition that the faucet next to the back door of Walker's apartment building was leaking when RLI took over management of the complex in January 2004, after Vividus Ltd. acquired the property. According to Hominsky, in mid-February 2004, she asked Keith Bloom, RLI's renovation manager, to turn off the water to the faucet. When she inspected the faucet and checked with Bloom later in February, she was satisfied that water to the faucet had been turned off. Homisky admitted, however, that although she was at the complex approximately three to five days a week and would "check the entire property," she did not "make it a point" to check the faucet again.
 {¶ 11} Penny Long, who lived in the same building as Walker from June 2001 through 2005, testified in deposition that in the Winter of 2004, she fell on ice that had built up around the back door as a result of the leaky faucet. Long testified further that prior to her fall, she had complained about the leaky faucet to the maintenance men at the complex, and asked them at least five or six times to put salt down on the ice by the back door, which would get at least an inch thick. When asked whether appellees had ever tried to fix the faucet, Long stated:
 {¶ 12} "They tried. I guess they tried turning off the water, but the water would never completely go off because it was still running. It still had an ice shield over the faucet with the water running down across the driveway. So when it got warmer *Page 6 
outside, they put the hose and had the hose going to the drain. That's when the problem got solved."
 {¶ 13} Long testified that water ran from the faucet "all year round" and tenants could "see and hear" the water running. In the winter, she said, tenants could see the ice buildup on the faucet and on the wall behind the faucet.
 {¶ 14} Walker testified in deposition that although the parking lot was wet on March 11, 2004, when she left the building, it was icy by the back door. She testified that she did not know how long the ice had been there:
 {¶ 15} "Q. How long had that ice been there, do you know?
 {¶ 16} "A. They had got that ice up. They had got it off the building and there off the parking lot. To my knowledge, Ken Ippolito told me-
 {¶ 17} "Q. I am not asking you what Ken told you.
 {¶ 18} "A. The water faucet was fixed. So I don't know how long the ice had been there. That was new ice right there. They had got that up already.
 {¶ 19} "Q. The water faucet was fixed?
 {¶ 20} "A. Yes.
 {¶ 21} "Q. And it is your understanding, you will agree with Laura Hominsky, that water faucet was shut off before your accident.
 {¶ 22} "A. It wasn't shut off.
 {¶ 23} "Q. How do you know? *Page 7 
 {¶ 24} "A. Because it was dripping again after my fall.
 {¶ 25} "Q. When after your fall was it dripping?
 {¶ 26} "A. After I got home from the hospital, they had a hose, black hose, thick hose on it, and it was running down in the sewer."
 {¶ 27} Later in her deposition, Walker clarified her earlier statement that the faucet had been fixed prior to her fall:
 {¶ 28} "Q. Your testimony is that you were aware that this faucet leaked, right?
 {¶ 29} "A. Yes. I was aware that it leaked. But I also was aware that it was fixed.
 {¶ 30} "Q. That's what I am trying to understand. When was the faucet fixed prior to your accident?
 {¶ 31} "A. Suppose[d] to have been two days before that.
 {¶ 32} "* * *
 {¶ 33} "Q. How is it that you know that the faucet was fixed a couple days before the accident?
 {¶ 34} "A. It was told to me by Ken. {¶ 35} "Q. Ken Ippolito?{¶ 36} "* * * *Page 8 
 {¶ 37} "Q. After your fall you were told by Ken Ippolito that the faucet had been previously fixed?
 {¶ 38} "A. Ken told me that months after I came home from the hospital."
 {¶ 39} Walker testified further that she had not used the back door for approximately one week prior to her fall.
 {¶ 40} This evidence, construed in a light most favorable to Walker, is sufficient to create genuine, material issues of fact regarding whether the leaky faucet had been fixed prior to Walker's fall and whether appellees knew or should have known that it was still leaking.
 {¶ 41} Specifically, Walker's and Long's testimony contradicts Hominsky's assertion that the faucet had been fixed in mid-February, before Walker's fall. It is not true, as appellees contend, that Walker admitted that the faucet had been fixed before her fall. Rather, she testified that Ippolito told her, months after her accident, that the faucet had been fixed two days prior to her fall. She testified further, however, that she knew it had not in fact been fixed, because it was still dripping after her fall, as evidenced by the black hose attached to the faucet and running to the sewer drain, which she saw when she came home from the hospital four days after her fall. Likewise, Long testified that although appellees tried to fix the faucet, the water from the faucet kept running throughout the winter, and the "problem got solved" when "it got warmer outside" only after appellees attached a hose to the faucet and ran the water down the drain. A reasonable inference from this testimony *Page 9 
is that, although appellees may have tried to fix the faucet in mid-February, their efforts were not successful.
 {¶ 42} Long's testimony also creates an issue of fact regarding whether appellees should have known that the faucet was not fixed. Long testified that tenants could both see and hear water running from the faucet throughout the winter. She testified further that ice would form on the faucet and on the wall behind the faucet. Hominsky testified that she checked the faucet once after she asked RLI `s renovation manager to turn off the water to the faucet, but admitted that, although she was at the complex frequently, she did not check the faucet again. In light of Long's testimony that the water running from the faucet and the ice forming on and around it were obvious, and her testimony that she asked the maintenance men at least five or six times in the Winter of 2004 to salt the ice forming as a result of the leaky faucet, we find a genuine issue of material fact regarding whether appellees should have known that the faucet was not fixed. Walker's testimony that she did not notice any leaking in the two days prior to her fall is irrelevant, because she testified that she had not used the backdoor of her apartment building in the week prior to her fall.
Potholes in the Parking Lot
 {¶ 43} With respect to Walker's fall in the parking lot, the trial court granted summary judgment to appellees because, it concluded, Walker had failed to "create *Page 10 
any genuine issues of material fact regarding the condition of the parking lot and [appellees'] lack of notice of that condition." We disagree.
 {¶ 44} Hominsky testified in deposition that there were "a lot" of potholes in the parking lot when RLI took over management of the apartment complex in January 2004, and admitted that the parking lot was not fixed until Spring 2005, when the entire lot was repaved. Walker testified that she complained to Hominsky and RLI's maintenance men about the potholes in the parking lot at least four to five times a month until the parking lot was fixed. Long testified that "Ken's people" made some repairs to the parking lot in the Winter of 2004 after RLI took over management of the complex because "a lot of people were having car problems" due to the potholes. Accordingly, there is evidence that appellees had actual notice of an unsafe condition in a common area of the premises.
 {¶ 45} Appellees argue, however, in reliance on Perry v. HarvardMarathon, Inc., Cuyahoga App. No. 86633, 2006-Ohio-2592, that they were not on notice of the specific pothole that Walker allegedly fell in and, therefore, cannot be held to have had notice of the condition. We find appellees' reliance on Perry misplaced. That case involved a business owner's liability to its business invitee, not a landlord's violation of a statutory duty to keep the "common areas of the premises in a safe and sanitary condition" for its tenants. Here, there is evidence that appellees were on notice that the parking lot was filled with potholes. *Page 11 
 {¶ 46} Appellees next argue that a landlord is only liable where the landlord has "superior knowledge" of the defect that led to the injury. Thus, they contend, even if they had a generalized knowledge about the condition of the parking lot, they are not liable because Walker obviously knew about the potholes in the parking lot too, and should have protected herself from them. Appellees' argument fails.
 {¶ 47} First, the quotation regarding a property owner's "superior knowledge" of a danger which appellees direct us to is found inLaCourse v. Fleitz (1986), 28 Ohio St.3d 209, 210, and not inShroades v. Rental Homes, Inc. (1981), 68 Ohio St.2d 20, which appellees cite. The difference is important.
 {¶ 48} In LaCourse, the Ohio Supreme Court addressed the "sole question" of whether a landlord has a duty, at common law or by virtue of the Landlord and Tenant Act, to keep common areas of the leased premises free of natural accumulations of ice and snow. The Supreme Court found no such duty. It noted that an owner of property is not liable for injuries to business invitees who slip and fall on natural accumulations of ice and snow, because the owner has the right to assume that his visitors will appreciate the risk and take action to protect themselves. Explaining, the Supreme Court stated, "[i]t is only where it is shown that the owner had superior knowledge of the particular danger which caused the injury that liability attaches, because in such a case the invitee may not reasonably be expected to protect himself from a risk he cannot fully appreciate." Id. at 210. The Supreme Court specifically found, however, that the principle of "superior *Page 12 
knowledge" applies only in the context of natural accumulations of ice and snow. It stated, "[t]his natural and unconcealed condition is distinguishable from other conditions, such as a loose stair railing or open elevator shaft, which are often not obvious to the user." Id. at 211.
 {¶ 49} In Shroades, supra, the Ohio Supreme Court addressed a case not involving a natural accumulation of ice and snow, and held that the landlord's failure to repair, in violation of R.C. 5321.04(A), after notice of a defect, was negligence per se, even though the tenant obviously knew about the defect before she was injured. The tenant had notified her landlord of several defective steps leading to her second floor apartment. The landlord did not fix the steps and the tenant was subsequently injured when she fell through one of the steps. She later sued the landlord for violation of the landlord's duty to repair under Ohio's Landlord and Tenant Act. The Ohio Supreme Court upheld the jury's verdict finding the landlord liable, stating:
 {¶ 50} "[A]ppellee sustained injuries when a step on the outside stairway collapsed. Under R.C. 5321.04(A)(2), the landlord had a duty to `[m]ake all repairs and do whatever is reasonably necessary to put and keep the premises in a fit and habitable condition.' The landlord received notice of the defect but failed to fulfill these duties and, thus, violated the statute. This violation constitutes negligence per se. Whether the tenant's intervening act of using the stair broke the causal connection between the landlord's negligence per se and the injury depends upon *Page 13 
whether the intervening act was reasonably foreseeable by the landlord. The jury apparently found that the appellee's injuries were proximately caused by the landlord's negligence. It is reasonable for the jury to have concluded that the chain of causation was not broken because it was foreseeable that the tenant would use the stairs. Therefore, the landlord is liable for the injuries proximately caused by its failure to fulfill the duties imposed by the statute." Id. at 26.
 {¶ 51} Here, there is evidence that appellees had notice that the parking lot was filled with potholes, but failed to adequately fix them. Accordingly, there are issues of fact regarding whether appellees were negligent and whether Walker's injuries were proximately caused by appellees' negligence.
 {¶ 52} Finally, appellees argue that the open and obvious doctrine bars Walker's claims. Their argument fails. First, it is well-settled that arguments not raised below should not be considered for the first time on appeal. State ex rel. Gutierrez v. Trumbull Cty. Bd. ofElections (1992), 65 Ohio St.3d 175, 177. Moreover, as this court stated in Harris v. Richmond Park Apts., Cuyahoga App. No. 84067,2004-Ohio-4081, at [24:
 {¶ 53} "The open and obvious doctrine goes to negating the common law duty of ordinary care owed by premises owners to their business invitees in maintaining the premises in a reasonably safe condition and to warn their invitees of latent or hidden dangers. In this case, [appellant] is claiming a breach of the duty imposed upon all landlords through the provisions of R.C. 5321.04(A). Since it relates to a *Page 14 
different duty, defendants' reliance on the open and obvious doctrine is misplaced. The open and obvious doctrine does not negate defendants landlord's statutory duty. Accord, Schoefield v. Beulah Rd., Inc. (Aug. 9, 1999), Franklin App. No. 98AP-1475." (Internal citations omitted.)
 {¶ 54} Because there are genuine issues of material fact regarding whether the leaky faucet was fixed prior to Walker's fall and whether appellees knew or should have known that it was still leaking, whether appellees knew about the potholes in the parking lot but failed to adequately fix them, and whether Walker's injuries were the proximate result of appellees' failure to fix the leaky faucet and/or the potholes in the parking lot, we reverse the trial court's judgment granting summary judgment to appellees and remand for trial.
It is ordered that appellant recover from appellees costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
 JAMES J. SWEENEY, P.J., and MARY J. BOYLE, J., CONCUR *Page 1